UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| CELSO MARTINS, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | CIVIL ACTION NO. |
| | ) | 11-11313-DPW |
| v. | ) | |
| | ) | |
| 3PD, Inc., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

MEMORANDUM AND ORDER
March 28, 2013

Celso Martins and Alexandre Rocha are federally authorized
delivery drivers who worked, directly or indirectly, for 3PD,
Inc., a delivery and logistics company.  Mr. Martin and Mr. Rocha
bring this action against 3PD alleging that it unlawfully shifted
various business costs to its employees by classifying them as
independent contractors in violation of Massachusetts state law.
Mr. Martins and Mr. Rocha also seek to represent a class of
similarly situated individuals.

The parties have filed a variety of motions and cross-
motions.  Plaintiffs seek to amend the Complaint to add a new
named plaintiff and two individual defendants; they also seek to
certify the class.  Both Plaintiffs and Defendants move for
summary judgment regarding various aspects of the case.

## I.  BACKGROUND

### A.  *Massachusetts Wage Law*

Massachusetts state wage law includes a presumption of employment status.  *See Somers* v. *Converged Access, Inc.*, 911 N.E.2d 739, 747 (Mass. 2009).  Section 148B establishes that a worker performing services is an employee for purposes of various provisions of the Massachusetts wage laws, including M.G.L. §§ 149 and §§ 151, unless three circumstances are met.  Specifically, the statute provides that,

> an individual performing any service, except as authorized under this Chapter, shall be considered to be an employee . . . unless . . .
>
> 1) The individual is free from control and direction in connection with the performance of the service, both under his contract for the performance of service and in fact; and
>
> 2) The service is performed outside the usual course of the business of the employer; and
>
> 3) The individual is customarily engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the service performed.

M.G.L. 149 § 148B(a).  This test is conjunctive; an employer must prove all three elements in order to show that an individual is an independent contractor and not an employee.  *Somers*, 911 N.E.2d at 747.  Under Massachusetts wage law, an employer may not deduct certain expenses from its payment to employees, such as expenses for workers' compensation and administrative costs.  *See*

*generally* M.G.L. 149 §§ 148, 150.  An employer cannot exempt
itself from these prohibitions by contract.  M.G.L. 149 § 148
("No person shall by a special contract with an employee or by
any other means exempt himself from this section or from section
one hundred and fifty.").

### B.    *Facts*

#### 1. The Parties

3PD is a Georgia corporation with its principal place of
business in Marietta, Georgia.  It provides "last-mile" delivery
and logistics services for large merchants such as General
Electric, Home Depot, and Lowe's.[1]  3PD began to offer its
services in Massachusetts when it acquired General Transportation
Services, Inc. ("GTS") in 2006.

Celso Martins and Alexandre Rocha provide truck
transportation, delivery, and sometimes installation for 3PD's
customers' products.  Both are federally authorized to be motor
carriers by the Federal Motor Carrier Safety Administration
("FMCSA").  Mr. Martins began working for GTS in 2004, and
continued working for 3PD after the acquisition until April 2011.
Mr. Rocha began working for GTS in 2003 and continued working for
3PD through AAR Trucking until May 2011.  Mr. Rocha incorporated
his delivery business in 2006 under the name AAR Trucking, Inc.

---

[1] 3PD purports to dispute that it provides delivery services,
but, as addressed below, *infra* Section IV(B)(2)(a), I find that
this purported dispute is not genuine.

Both Mr. Martins' business and AAR Trucking operated multiple delivery trucks for 3PD.

Both Mr. Martins and Mr. Rocha worked for 3PD making deliveries full time, five days per week.  For 16 months in 2009-2010, Mr. Rocha also worked as a delivery driver for another company, Home Delivery America, during the two days each week that he did not work for 3PD.  They arrived at the warehouse or retail store each morning and received the products for delivery along with a set of delivery time periods - "windows" - and were required to make their deliveries within those windows.  3PD required Plaintiffs to check in by phone at the start and completion of each delivery.  Sometimes Mr. Martins was also responsible for installing the appliances he delivered and for hauling away the old appliances.  3PD's customers would complete surveys evaluating the delivery drivers, and a 3PD Manager testified that when a driver "did not perform up to expectations . . . disciplinary actions were taken," such as termination or the withdrawal of delivery opportunities for a period of days.

Both Mr. Martins and Mr. Rocha recruited other drivers to operate additional routes under their Delivery Service Agreements ("DSA"s) with 3PD.  3PD paid Mr. Martins and AAR Trucking for these additional routes, and Mr. Martins and AAR Trucking were responsible for paying the other drivers operating under their respective DSAs.

## 2.   The Delivery Service Agreements

The DSAs between 3PD and Plaintiffs are materially identical.  3PD has least 66 additional DSAs with other federally licensed motor carriers to deliver merchandise in Massachusetts. As with the DSAs with Mr. Martins and AAR Trucking, some of these 66 other agreements include multiple drivers performing services for 3PD.  The DSAs were non-negotiable.

The DSAs state that "3PD provides logistical, transportation and delivery services for a number of substantial retail national accounts" and that "such services often involve delivery of retail merchandise directly into residences."  These agreements declare that "both 3PD and Contract Carrier intend that the services provided under this Agreement will be strictly as an independent contractor and not as an employee of 3PD for any purpose."  As such, the DSAs require Plaintiffs to represent that they are fully qualified federal motor carriers and that Plaintiffs bear the responsibility to obtain all "certificates, permits, franchise or licenses required in connection with the performance of such services."  Plaintiffs, as contract carriers under the DSA, also bear the responsibily for regulatory compliance.

Plaintiffs are responsible for supplying their own trucks, helpers and other drivers, and for paying for insurance, fuel, maintenance, and the other costs of the delivery business.

However, Plaintiffs' equipment and services must meet 3PD's standards and requirements.  For instance, 3PD requires that Plaintiffs paint their trucks with the 3PD logo.

In 2008, 3PD informed Mr. Martins that his trucks no longer met 3PD's standards and that he must acquire new trucks in accordance with 3PD's standards within three days.  Mr. Martins testified that for fear of losing his contract by not being able to find suitable trucks in time, he leased the new trucks from 3PD.

Plaintiffs are also required to wear "an appropriate uniform" and "keep his/her personal appearance consistent with reasonable standards of the consumer delivery industry."  Any additional drivers or helpers must pass a background check.  The DSAs require Plaintiffs to post a bond or maintain a fund with 3PD so that 3PD can deduct the amount of any damage to products for delivery.

The DSAs do not include a non-competition agreement and Plaintiffs were free to make deliveries for other companies.

## II.  MOTION TO AMEND THE COMPLAINT

Plaintiffs seek to amend the Complaint in order to add two individual defendants - Bud Workman, President of 3PD, and Karl Meyer, owner and Chief Operating Officer of 3PD - and a new Plaintiff - Calvin Anderson.

## A.    *Standard of Review*

A party has the right to amend its complaint "as a matter of course" up to 21 days after service of an answer or motion to dismiss.  Fed. R. Civ. P. 15(a)(1).  However, after this 21-day period, "a party may amend its pleading only with the opposing party's written consent or the court's leave."  Fed. R. Civ. P. 15(a)(2).  Plaintiffs filed their motion to amend on April 23, 2012, approximately nine months after 3PD filed its answer and counterclaims on July 25, 2011.  Because 3PD opposes Plaintiffs' motion to amend, Plaintiffs seek the court's leave to amend.

The Federal Rules of Civil Procedure instruct that "[t]he court should freely give leave [to amend] when justice so requires."  *Id.*  This reflects a generally permissive amendment policy.  *See O'Connell* v. *Hyatt Hotels of P.R.*, 357 F.3d 152, 154 (1st Cir. 2004).  In the early stages of litigation, grounds for denial are generally limited to "undue delay, bad faith or dilatory motive . . . , undue prejudice to the opposing party . . . , [and] futility of amendment."  *ACA Fin. Guaranty Corp.* v. *Advest, Inc.*, 512 F.3d 46, 55-56 (1st Cir. 2008) (quoting *Foman* v. *Davis*, 371 U.S. 178, 182 (1962)).  However, the longer a party waits before filing its motion to amend, the more exacting the standard becomes.  Certain milestones, such as a scheduling order, close of discovery, or a timely-filed motion for summary

judgment, may change a court's hospitality toward a motion to amend.

As the deadline for the close of discovery approaches, the possibility of undue prejudice to the opposing party increases, and courts particularly disfavor "motions to amend whose timing prejudices the opposing party by 'requiring a re-opening of discovery with additional costs . . . , and a likely major alteration in trial tactics and strategy . . . .'" *Steir* v. *Girl Scouts of the USA*, 383 F.3d 7, 12 (1st Cir. 2004) (quoting *Acosta-Mestre* v. *Hilton Int'l of P.R., Inc.*, 156 F.3d 49, 52 (1st Cir. 1998)).

Once the deadline for amendment set in a scheduling order has passed, "the liberal default rule is replaced by the more demanding 'good cause' standard of Fed. R. Civ. P. 16(b)." *Id.*

Finally, when a motion to amend comes after a timely filed motion for summary judgment, "a plaintiff is required to show "substantial and convincing evidence" to justify a belated attempt to amend a complaint." *Id.*

Nevertheless, a district court "enjoys significant latitude in deciding whether to grant leave to amend." *Advest, Inc.*, 512 F.3d at 55-56.

## B.   *Discussion*

This case falls into that part of the spectrum between the permissive and more exacting standards.  Plaintiffs filed their

motion to amend near the close of discovery, but during a stay
pending the outcome of mediation.  At the time of the motion,
Plaintiffs represent that they had conducted paper discovery but
had not yet conducted any depositions.  I now consider the motion
to amend simultaneously with the cross-motions for summary
judgment and the motion for class certification, recognizing that
by granting the motion in part, some additional discovery may be
necessary.

### 1.   Additional Defendants

First, Plaintiffs seek to add two 3PD officers as
individual defendants.  Plaintiffs' stated reason for this
proposed amendment is that due to "the flux in the trucking
industry," 3PD may go out of business or otherwise be unable to
pay a potential judgment and the individual defendants represent
an alternative source for collecting on a judgment.  Plaintiffs
contend that the individual defendants will not be prejudiced by
this amendment because they have been actively engaged in the
company's defense since the inception of the action.  However,
to grant the motion now would require Plaintiffs to serve the
individual defendants, for Defendants to answer, and would likely
require reopening discovery.  Plaintiffs do not contend that they
recently learned the identities of the proposed individual
defendants, nor do they provide any other explanation for the
delay.  *Data General Corp.* v. *Grumman Sys. Support Corp.*, 825 F.

Supp. 340, 345 (D. Mass. 1993) ("This is not a case in which
previously unknown or undisclosed facts were brought to light at
a late stage of discovery or at trial.").

3PD also argues that the motion to amend should be denied
for failure to comply with Local Rule 15.1, which requires that
an attorney seeking to add a party must seek amendment "as soon
as [the] attorney reasonably can be expected to have become aware
of the identity of the proposed new party."  Local Rule 15.1(a).
As discussed above, Plaintiffs cannot reasonably contend that
they sought to add the individual defendants as soon as they were
aware of their identities.  Local Rule 15.1 also requires that "a
party seeking to amend a pleading to add a new party shall serve
. . . the motion to amend upon the proposed new party at least 14
days in advance of filing the motion, together with a separate
document stating the date on which the motion will be filed."
Local Rule 15.1(b).  Plaintiffs do not dispute their failure to
serve the proposed new defendants 14 days in advance of their
motion.  This failure to comply with the local rules may be an
independent ground for denial of a motion to amend.  *McGee* v.
*Benjamin*, No. 08-cv-11818, 2012 WL 959377, at *11 n.12 (D. Mass.
Mar. 20, 2012); *see also Gwyn* v. *Loon Mountain Corp.*, 350 F.3d
212, 218 (1st Cir. 2003) (affirming denial of leave to amend for
failure to comply with a District of New Hampshire Local Rule).

Given the circumstances, I will deny Plaintiffs' motion to amend the complaint to add the individual defendants.

## 2.   Additional Plaintiff

Plaintiffs also seek to amend the Complaint to add Calvin Anderson as a named plaintiff.  Mr. Anderson is a federally certified delivery driver, who made deliveries for 3PD from the time 3PD acquired Home Delivery Group, LLC, until March 2012.  He therefore fits into Plaintiffs' proposed class: "all individuals who performed delivery services as drivers for 3PD in Massachusetts at any time from June 1, 2008 to the present."

This aspect of the motion does not pose the same problems as above.  Plaintiffs represent that they were unaware of 3PD's acquisition of Home Delivery Group until February 2012, only two months before filing the motion to amend, and at a time when this action was stayed for purposes of mediation.  Defendants argue that allowing Mr. Anderson to become a named plaintiff amounts to creating "a new lawsuit against a new company."  That argument is overblown.  Plaintiffs seek only to add a new named plaintiff, not a new defendant.  This does not change 3PD's liability.  Mr. Anderson qualifies as a proposed class member whether or not he is a named plaintiff.  The extent to which 3PD is liable for deductions made by Home Delivery Group under a theory of successor liability does not turn on Mr. Anderson's status as a named plaintiff or class member.  His status as a named plaintiff

11

may allow counsel to represent the interests of the various members of the class more adequately, but Mr. Anderson's 'promotion' from class member to named plaintiff has no effect on 3PD's liability.

I find no undue delay or prejudice in Plaintiffs' motion to add Mr. Anderson as a named plaintiff and will allow the motion to amend to that extent.

### III.  CLASS CERTIFICATION

Plaintiffs move to certify a class of "all individuals who performed delivery services as drivers for 3PD in Massachusetts at any time from June 1, 2008 to the present" (including drivers who made deliveries for Home Delivery Group, which 3PD acquired in November 2011), for all counts in the Complaint.

### A.  *Standard of Review*

Class certification is governed by Fed. R. Civ. P. 23.  A proposed class must meet the four requirements of Rule 23(a) - numerosity, commonality, typicality, and adequacy - and at least one of the requirements of Rule 23(b).  *Wal-Mart Stores, Inc.* v. *Dukes*, 131 S.Ct. 2541, 2548 (2011); *Comcast* v. *Behrend,* -- S.Ct. ---, 2013 WL1222646, *4 (Mar. 27, 2013) Fed. R. Civ. P. 23(a)-(b).  In this case, Plaintiffs proceed under Rule 23(b)(3), which requires that common questions of law "predominate" over individual questions, and "that a class action is [a] superior . . . method" of adjudicating the case.  District courts have broad

discretion in deciding whether to certify a class, *see Funeral Consumers Alliance, Inc.* v. *Service Corp. Int'l*, 695 F.3d 330 (5th Cir. 2012); *Young* v. *Nationwide Mut. Ins. Co.*, 693 F.3d 532, 536 (6th Cir. 2012), but must conduct "a rigorous analysis of the prerequisites established by Rule 23," *Smilow* v. *Southwestern Bell Mobile Sys., Inc.*, 323 F.3d 32, 38 (1st Cir. 2003).

At the class certification stage, "the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." *Eisen* v. *Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974).  Nevertheless, "[i]t would be contrary to the rigorous analysis of the prerequisites established by Rule 23 . . . to put blinders on as to an issue simply because it implicates the merits of the case." *In re New Motor Vehicles Canadian Export Antitrust Litig.*, 522 F.3d 6, 17 (1st Cir. 2008). A court may certify a class as to one or more claims without certifying as to all claims alleged in the complaint.  *See* Fed. R. Civ. P. 23(c)(4).

**B. Discussion**

    1. <u>Numerosity</u>

Rule 23(a)(1) requires that "the class is so numerous that joinder of all members is impracticable."  3PD has entered into more than 60 DSAs with various motor carriers, some of which implicate multiple drivers who may be classified as employees

under Section 148B.  3PD does not contest numerosity and I find
that Plaintiffs have satisfied the requirements of Rule 23(a)(1).
*Cf. In re New Motor Vehicles Canadian Export Antitrust Litig.*,
522, F.3d 6, 19 (1st Cir. 2008).

   2. Commonality

_____Rule 23(a)(2) requires that "there are questions of law or
fact common to the class."  The Supreme Court recently clarified
that the language of Rule 23(a)(2) can be deceptive.  The thrust
of the inquiry is not truly "the raising of common 'questions' -
even in droves - but rather the capacity of a classwide
proceeding to generate common *answers* apt to drive the resolution
of the litigation."  *Wal-Mart*, 131 S.Ct. at 2551 (internal
quotations omitted) (emphasis in original).  In other words, the
class claims "must depend upon a common contention . . . of such
a nature that it is capable of classwide resolution - which means
that determination of its truth or falsity will resolve an issue
that is central to the validity of each one of the claims in one
stroke."  *Id.*

   That Part 2 of the Section 148B test presents common
questions of law and fact is beyond dispute.  The putative class
is composed of "individuals who performed delivery services . . .
for 3PD."  The inquiry under Part 2 is whether delivery services
were in the usual course of 3PD's business. Not only does this

present common issues of law and fact, but *only* evidence common
to the class is relevant to this consideration.

There is also a sufficient showing of commonality as to Part
1 of the Section 148B test.  The DSAs governing the class members
work for 3PD are nearly identical, and the undisputed facts show
that 3PD systematically applied the same kinds of policies to
each of the drivers.  This is precisely the kind of "general
policy" contemplated by the Supreme Court in *Wal-Mart* that lends
itself to class litigation.  *See id.* at 2553.

Plaintiffs have therefore satisfied their burden of showing
that Count I of the Complaint relies on common evidence.[2]  Counts
II (Wage Act) and III (unjust enrichment) are dependant on Count
I (employment classification).  If Plaintiffs cannot succeed in
showing that they are employees of 3PD under Massachusetts Law,
then they cannot show that any deductions or costs that 3PD
imposed were improper.  Determination of Plaintiffs' employment
status will "resolve [the] issue that is central to the validity"
of Counts II and III "in one stroke."  *Id.* at 2551.  Although
there will be some individual issues regarding the amounts of
damages and who is entitled to recover, these questions arise in

---

[2] I do not reach the question of whether Plaintiffs may satisfy
Part 3 of the Section 148B test with common evidence because, as
discussed below, *infra* Section IV(B)(2)(a), Plaintiffs are
entitled to summary judgment with respect to Part 2 of the test,
which, in turn entitles them to summary judgment as to the
entirety of Count I.

terms of typicality and predominance, not commonality.  *See Marcus* v. *BMW of N. Am., LLC*, 687 F.3d 583, 597 (3d Cir. 2012) ("Rule 23(a)(2)'s commonality requirement does not require identical claims or facts among class members." (internal quotations and alterations omitted)); *Natchitoches Parish Hosp. Serv. Dist.* v. *Tyco Int'l, Ltd.*, 247 F.R.D. 253, 264 (D. Mass. 2008) ("[C]ommonality[] does not require that all putative class members share identical claims." (internal quotations omitted)).

   3. <u>Typicality</u>

   Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  As a consequence, "[t]he commonality and typicality requirements . . . tend to merge." *Gen. Tel. Co. of Southwest* v. *Falcon,* 457 U.S. 147, 157 n.13 (1982).  Here also, Plaintiffs' claims need not be identical.  *See Natchitoches*, 247 F.R.D. at 264.  Instead, it is sufficient that "the claims or defenses of the class and the class representative arise from the same event or pattern or practice and are based on the same legal theory." *In re Relafen Antitrust Litig.*, 231 F.R.D. 52, 69 (D. Mass. 2005).  In other words, "as goes the claim of the named plaintiff, so go the claims of the class." *Stout* v. *Byrider*, 228 F.3d 709, 717 (6th Cir. 2000).

   3PD argues only that "[Mr.] Martins' claims are not typical of [Mr.] Rocha's let alone those of the absent class" because 3PD

contracted with Mr. Martins directly, but Mr. Rocha worked pursuant to a contract that 3PD entered into with AAR Trucking. This is not a material distinction.  As discussed below, *see infra* Section IV(B)(2)(a), it is clear from the plain meaning of Section 148B, the Attorney General Advisory, and applicable case law, that an individual can bring a claim under Section 148B even if he has incorporated his business and his putative employer's formal relationship is with the corporate entity.  Therefore, Mr. Rocha stands in the same position as Mr. Martins, and other putative class members.  *See De Giovanni* v. *Jani-King*, 262 F.R.D. 71, 86 (D. Mass. 2009) (finding named plaintiff typical in a Section 148B action despite that he incorporated his business and hired his own employees under the corporate entity's agreement with the defendant).

### 4. Adequacy

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class."  There are two parts to this inquiry.  First, Plaintiffs must show that "the interests of the representative party will not conflict with the interests of any of the class members." *Andrews* v. *Bechtel Power Corp.*, 780 F.2d 124, 130 (1st Cir. 1985).  Second, Plaintiffs must show that "counsel chosen by the representative party is qualified, experienced and able to vigorously conduct

the proposed litigation." *Id.* 3PD does not contest the adequacy of Plaintiffs' counsel.

3PD does allege that the interests of the named plaintiffs conflict with those of the putative class members. It argues that because Plaintiffs' claims seek payment for actual deductions, and not the value of work each plaintiff performed, their interests conflict with individual drivers who worked for 3PD but were not party to a contract, and as a result, 3PD did not directly deduct from their pay. However, the named plaintiffs represent both potential kinds of class members. Mr. Martins is an individual who was directly party to a DSA with 3PD and Mr. Rocha is an individual who worked pursuant to a DSA between 3PD and a corporate entity. Mr. Andersen was directly party to a DSA with Home Delivery Group when 3PD acquired Home Delivery Group. Therefore, I find that the named Plaintiffs can adequately represent the class. *See Jani-King,* 262 F.R.D. at 86 (certifying a class in a Section 148B claim where some parties worked directly for Jani-King and others worked through a corporate entity).

5. Predominance and Superiority

Rule 23(b)(3) requires that common questions of law "predominate" over individual questions, and "that a class action is [a] superior . . . method" of adjudicating the case. It requires "merely that common issues predominate, not that all

issues be common to the class." *Smilow*, 323 F.3d at 39.   In

particular, "courts generally find the predominance requirement

to be satisfied even if individual damages issues remain."[3]   *Id.*

at 40.   The important factors in this inquiry are efficiency and

---

[3] The Supreme Court this week has called this proposition into
question, though it has not extinguished it entirely.   *See*
*Comcast* v. *Behrend*, -- S.Ct. ----, 2013 WL 1222646 (Mar. 27,
2013).   The courts of appeals have agreed that common questions
of liability can predominate in some cases even if some
individual issues of damages remain*, see, e.g., Smilow*, 323 F.3d
at 39; *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d
124, 139 (2d Cir. 2001); *Arreola* v. *Godinez*, 546 F.3d 788, 801
(7th Cir. 2008), while in other cases, questions of damage
calculation are so complex or implicate so many potential class
members, that they present a "Herculean task" and overwhelm
liability issues, defeating predominance under Rule 23(b)(3),
*Newton* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d
154, 187 (3d Cir. 2001); *see, e.g., Broussard* v. *Meineke Discount*
*Muffler Shops, Inc.*, 155 F.3d 331, 342-43 (4th Cir. 1998);
*Windham* v. *American Brands, Inc.*, 565 F.2d 59, 68 (4th Cir.
1977).   In *Comcast*, the Supreme Court assumed - because the
parties did not contest - but did not expressly hold, that the
dispute it was addressing fell into the latter, "Herculean task"
category that in order to satisfy Rule 23(b)(3), the plaintiff
needed to show (1) injury "capable of proof . . . through
evidence . . . common to the class," and notably, (2) "that the
damages resulting from that injury were measurable 'on a class-
wide basis.'" *Comcast*, 2013 WL 1222646, *1.   The Court neither
expressly confined its decision to this latter "Herculean task"
category of cases, nor did it mentioned the distinction between
the two categories other than to comment that "[t]he permutations
involving four theories of liability and 2 million subscribers
located in 16 counties [in this case] are nearly endless."
*Comcast*, 2013 WL 1222646, at *6.   Nevertheless, because the case
arrived at the Supreme Court in a posture where the parties
agreed both to a distinction between the categories and to the
fact that *Comcast* fell into the latter category, I interpret it
not to foreclose the possibility of class certification where
some individual issues of the calculation of damages might
remain, as in the current case, but those determinations will
neither be particularly complicated nor overwhelmingly numerous.

judicial economy.  *Otte ex rel. Estate of Reynolds* v. *Life Ins. Co. of N. Am.*, 275 F.R.D. 50, 58 (D. Mass. 2011).

Common questions plainly predominate with respect to Count I.  As discussed in more detail both above, *see supra* Section III(B)(2), and below, *see infra* Section IV(B)(2)(a), Plaintiffs can and do prevail on Count I based entirely on common questions and common evidence.  Class actions are also the preferred vehicle for adjudicating employment classification claims. *See Jani-King*, 262 F.R.D. at 85-86 (citing *Nationwide Mut. Ins. Co.* v. *Darden*, 503 U.S. 318, 327 (1992)); *Athol*, 786 N.E.2d at 374 n.14).  Plaintiffs therefore satisfy the predominance and superiority requirements as to Count I.  *See id.*

The same, however, is not true of Counts II and III of the Complaint.  Although these Wage Act and unjust enrichment claims share a central and common threshold issue - whether Plaintiffs are employees of 3PD - individual issues regarding deductions and cost shifting predominate over this single threshold question. These individual issues are not limited to individual assessment of the measure of damages.  The individual issues go directly to questions of liability.  To prevail on the unjust enrichment claim, Plaintiffs must ultimately show "a benefit conferred on another whose retention of the benefit at plaintiff's expense would be unconscionable."  *Smith* v. *Jenkins*, 626 F. Supp. 2d 155, 170 (D. Mass. 2009).  Likewise, to prevail on the Wage Act claim,

Plaintiffs must ultimately show that 3PD made improper deductions from their pay.  *See* M.G.L. 149 §§ 148, 150.  No common form of proof exists to prove these elements for the entire class.  *See Comcast*, 2013 WL 1222646, *1 ("[T]o meet the predominance requirement respondents had to show . . . injury . . . capable of proof . . . common to the class . . . ." (internal quotations omitted)).

Some class members, such as Mr. Martins, contracted directly with 3PD, and 3PD made any deductions directly from its payments to him.  Other class members, such as Mr. Rocha both owned a corporate entity contracting with 3PD and performed services under a DSA, and 3PD made any deductions from its payments to the entity.  Still others, such as Mr. Sousa - described in 3PD's opposition to the motion for class certification - performed services for 3PD pursuant to a DSA between 3PD and a corporate entity, where the owner of the entity is not eligible to be a class member because he did not perform delivery driver services.[4]  Determining whether and from which class members 3PD made improper deductions and which class members would be entitled to recoup which costs would require complex individual

---

[4] As 3PD indicates, Plaintiffs cannot cure this deficiency by adding the corporate entities as plaintiffs because Section 148B does not apply to corporate entities.  *Weinberg* v. *Grande Circle Travel, LLC*, --- F. Supp. 2d ----, 2012 WL 4096611, at *6 (D. Mass. Sept. 19, 2012) ("[I]t is clear that [Section 148B] applies only to individuals who have been misclassified as independent contractors - not companies.").

inquiries not suited to class-wide litigation.  *Jani-King*, 262 F.R.D. at 84 ("No common source of proof exists to support the plaintiffs' prosecution of [the unjust enrichment and quantum meruit] claims; the extent of uncompensated performance and unjust retention of a benefit could only be ascertained through complex and disputed individual inquiries.  Thus, the Court denies the plaintiffs' motion to certify these claims as a class action.")

*          *          *

Due to the unique nature of employment classification claims, "[b]oth the United States Supreme Court and the Massachusetts Supreme Judicial Court have expressed a strong preference for rendering decisions on the classification of employees on [a] class wide basis." *Jani-King*, 262 F.R.D. at 85-86 (citing *Darden*, 503 U.S. at 327 (1992)); *Athol*, 786 N.E.2d at 374 n.14).  The same does not hold true for common law claims derivative of that classification.  Of necessity, a company's employee-classification scheme applies to all individuals classified under it.  Once classified, however, the company's treatment of those employees may differ widely.  Although common questions of law and fact plainly predominate regarding Count I of plaintiffs' Complaint (employment classification), individual questions predominate regarding Counts II (Wage Act) and III (unjust enrichment).  I therefore grant Plaintiff's motion for

class certification as to Count I, but deny it as to Counts II
and III.

## IV. SUMMARY JUDGMENT

As noted in the discussion above, Plaintiffs' Complaint
contains three counts:  Count I asserts that Plaintiffs are
employees of 3PD pursuant to M.G.L. 149 § 148B, notwithstanding
3PD's treatment of them as independent contractors.  Section 148B
sets out a three-part, conjunctive test: an individual performing
any services is an employee unless the employer can prove: (1)
the individual is free from the employer's control, (2) the
employees service is outside the usual course of the putative
employer's business, and (3) the individual operates his own
independent business, providing the same services as he provides
for the putative employer.  Count II alleges that 3PD improperly
relied on this misclassification to pass its business costs on to
Plaintiffs and to make deductions from Plaintiffs' pay in
violation of the Massachusetts Wage Law, M.G.L. 149 § 148.
Finally, Count III alleges that 3PD was unjustly enriched at
Plaintiffs' expense by shifting these business costs and making
these improper deductions.

The parties have filed cross-motions for partial summary
judgment with respect to various aspects of this case.
Plaintiffs move for summary judgment solely with respect to Count
I, and within Count I, solely with respect to Parts 1 and 2 of

23

the Section 148B test, arguing that, as a matter of law,
Plaintiffs were under 3PD's control and performed services within
the usual scope of 3PD's business.   3PD moves for summary
judgment against Mr. Martins on Counts II and III, arguing that
federal law preempts these claims.   3PD also moves for summary
judgment against Mr. Martins with respect to Part 2 of the
Section 148B test under Count I.   Finally, 3PD moves for summary
judgment against Mr. Rocha with respect to all three counts,
arguing (1) federal law preempts his claims, (2) Section 148B
contains no statutory remedy and (3) 3PD has no relationship with
Mr. Rocha, but rather with AAR Trucking, and therefore never
deducted any pay from or passed any costs onto Mr. Rocha himself.

## A.   *Standard of Review*

A movant is entitled to summary judgment when "there is no
genuine dispute as to any material fact and the movant is
entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a).
"A dispute is genuine if the evidence about the fact is such that
a reasonable jury could resolve the point in the favor of the
non-moving party," and "[a] fact is material if it has the
potential of determining the outcome of the litigation."   *Farmers
Ins. Exch.* v. *RNK, Inc.,* 632 F.3d 777, 782 (1st Cir. 2011)
(citation omitted).

I "view the facts in the light most favorable to the party
opposing summary judgment."   *Rivera-Colón* v. *Mills,* 635 F.3d 9,

10 (1st Cir. 2011).  However, "conclusory allegations, improbable inferences, and unsupported speculation" are insufficient to create a genuine issue of material fact to survive summary judgment.  *Sullivan* v. *City of Springfield*, 561 F.3d 7, 14 (1st Cir. 2009) (quotation and citation omitted).  In dealing with cross-motions for summary judgment, I "must view each motion, separately, through this prism."  *Estate of Hevia* v. *Portrio Corp.,* 602 F.3d 34, 40 (1st Cir. 2010).

**B. Discussion**

    1. Preemption

In the late 1970s and early 1980s, Congress deregulated the airline and trucking industries.  The Airline Deregulation Act of 1978 preempted state laws "relating to rates, routes, or services of any air carrier."  *See Morales* v. *Trans World Airlines*, *Inc.*, 504 U.S. 374, 378 (1992) (quoting 49 U.S.C. § 1305(a)).  As originally passed, the Motor Carrier Act of 1980, Pub. L. No. 96-296, 94 Stat. 793 (1980), did not contain such a preemption provision.  By 1994, "41 jurisdictions regulate[d], in varying degrees, intrastate prices, routes and services of motor carriers. . . . Typical forms of regulation include entry controls, tariff filing and price regulation, and types of commodities carried."  H.R. Conf. Rep. 103-677 at 86 (1994).  Congress then passed the Federal Aviation Administration and Authorization Act of 1994 ("FAAAA"), which contains a preemption

provision for the Motor Carrier Act nearly identical to that of the Airline Deregulation Act.  The FAAAA broadly preempts the enforcement of any state "law[s], regulation[s], or other provision[s] having the force and effect of law related to a price, route, or service of any motor carrier . . . , broker, or freight forwarder with respect to the transportation of property."  49 U.S.C. § 14501(c)(1).  Due to the similarity in the language of the preemption provisions, courts rely on Airline Deregulation Act case law in deciding preemption cases under the Motor Carrier Act.  *See Rowe* v. *N.H. Motor Transp. Ass'n*, 552 U.S. 364, 370 (2008) ("[W]e follow *Morales* in interpreting similar language in the 1994 Act before us here.").

3PD argues that Plaintiffs' claims are preempted by the FAAAA for two reasons: (1) they impermissibly seek to "enlarge or enhance the bargain" that the parties entered into, and (2) they would affect the price of motor carrier services.  Neither argument is persuasive.

Both arguments rely on the notion that Plaintiffs are not employees, but independent contractors – the question at the very heart of this action.  However, as discussed in more detail below, *see infra* Section IV(B)(2),  Plaintiffs are employees of 3PD under Massachusetts wage law.  For this and other reasons discussed in more detail below, I find that the FAAAA does not preempt Plaintiffs' claims.

a. *"Enlarging the Bargain"*

First, 3PD argues that the FAAAA preempts Plaintiffs' claims because the "claims require 'the enforcement of a state law . . . which exceeds those conditions voluntarily agreed upon by the parties.'" (quoting *Yellow Transp., Inc.* v. *DM Transp. Mgmt. Servs., Inc.,* No. Civ. A. 2:06CV1517, 2006 WL 2871745, at *2 (E.D. Pa. Jul. 14, 2006)).  3PD relies on a number of out-of-circuit, cases finding unjust enrichment and tort claims preempted by the FAAAA.  *See, e.g.*, *Mastercraft Interiors, Ltd.* v. *ABF Freights Sys., Inc.*, 284 F. Supp. 2d 284, 288 (D. Md. 2003) ("Under the existing case law, this Court may enforce the bargain of the parties, by permitting the breach of contract action, but may not enlarge or enhance the bargain [by permitting] [c]laims of misrepresentation, negligent misrepresentation, and unjust enrichment."); *Deerskin Trading Post, Inc.* v. *UPS*, 972 F. Supp. 665, 672 (N.D. Ga. 1997) ("[T]he Court finds that a state law tort action against a carrier, where the subject matter of the action is related to the carrier's

prices, routes, or services . . . is preempted by the FAAAA.").[5]

---

[5] 3PD also relies on two cases from the District of Massachusetts, in which judges have held that the Airline Deregulation Act preempted unjust enrichment claims.  *See Mitchell* v. *US Airways, Inc.*, No. 08-10629, 2012 WL 2856108 (D. Mass. Jul. 12, 2012); *Mitchell* v. *US Airways, Inc.*, 858 F. Supp.

3PD's reliance on this line of caselaw is misplaced.  Those
cases rely on the Supreme Court's decision in *Wolens*, stating

> The ADA's preemption clause . . . stops States from
> imposing their own substantive standards with respect
> to rates, routes, or services, but not from affording
> relief to a party who claims and proves that an airline
> dishonored a term the airline itself stipulated.  This
> distinction . . . confines courts, in breach of
> contract actions, to the parties' bargain, with no
> enlargement or enhancement based on state laws or
> policies external to the agreement.

*Am. Airlines, Inc.* v. *Wolens*, 513 U.S. 219, 232 (1995).  *Wolens*
allows a plaintiff to bring a breach of contract action against
an airline or motor carrier, but prevents him from seeking to
expand the scope of recoverable damages by bringing additional,
common law claims such as unjust enrichment, negligence, and
fraud.  *See id.*  Under *Wolens*, the parties are confined to the
scope of their contract.  The current case stands in a strikingly
different posture.  Plaintiffs' Wage Act and unjust enrichment
claims are derivative of their Section 148B claim.

Plaintiffs do not bring this action in their capacity as
parties to a contract with 3PD.  Rather, they bring this action
as putative employees of 3PD under Massachusetts employment law.

---

2d 137 (D. Mass. 2012).  However, these cases involve claims by
Skycaps against an airline for implementing a fee for curb-side
bag check, purportedly in violation of the Massachusetts tip law.
Unlike the instant case, those cases fall squarely within the
ambit of *DiFiore* v. *American Airlines, Inc.*, 646 F.3d 81, 86 (1st
Cir. 2011), directly regulating the price of services, not
employment standards which indirectly affect prices through
market-price calculus.  *See infra* Section IV(B)(1)(b).

Therefore the "expand the bargain" line of case law is inapplicable.  Plaintiffs common law claims are not attempts to enforce or expand any bargain, but to clarify 3PD's obligations as an employer or proprietor.

   *b. Effect on "Price, Route, or Service"*

   Second, 3PD contends that, as applied, the Wage Act and common law claims are preempted because they "will change the market-dictated prices Martins and 3PD agreed to."  3PD correctly states that the FAAAA may preempt Plaintiffs' claims even if the "state law's effect on rates, routes or services 'is only indirect.'"  *Rowe*, 552 U.S. at 370 (quoting *Morales*, 504 U.S. at 386).  There is no presumption against preemption in areas traditionally regulated by state law.  *Hawaiian Airlines, Inc.* v. *Norris*, 512 U.S. 246, 252 (1994); *see also DiFiore* v. *American Airlines, Inc.,* 646 F.3d 81, 86 (1st Cir. 2011).

   However, the FAAAA's preemption provision does not have infinite reach.  3PD's suggestion that the FAAAA preempts wage laws because they may have an indirect impact on 3PD's pricing decisions amounts to an invitation to immunize it from all state economic regulation.  This is an invitation I decline to accept. *See DiFiore*, 646 F.3d at 87 (finding that the Supreme Court in *Morales* and *Rowe* did not intend "to free airlines from most conventional common law claims for tort, from prevailing wage laws, and ordinary taxes applicable to other businesses").  Two

Massachusetts trial courts have specifically addressed this issue and have come to the same conclusion, holding that the FAAAA does not preempt Section 148B. *See Derochers* v. *Staples, Inc.*, No. MICV200904845, 2010 WL 6576214, *2-3 (Mass. Super. Ct. Jun. 8, 2010); *Oliveira* v. *Advanced Delivery Sys., Inc.*, No. 091311, 2010 WL 4071360, at *3-4 (Mass. Super. Ct. Jul. 16, 2010). 3PD claims that such a conclusion cannot survive *DiFiore*'s declaration that areas of traditional state regulation are not exempt from preemption. However, this misapprehends the distinction that *DiFiore* draws.

In *DiFiore*, the First Circuit specifically rejected the position 3PD advances here: that state regulation is preempted simply because it affects the market forces at work in its pricing decisions. *DiFiore*, 646 F.3d at 89 ("We do not endorse American [Airlines]'s view that state regulation is preempted wherever it imposes costs on airlines and therefore affects fares because costs 'must be made up elsewhere . . . .' This would effectively exempt airlines from state taxes, state lawsuits of many kinds, and perhaps most other state regulation of any consequence.") Instead, the *DiFiore* court held that the FAAAA preempted a Massachusetts Tip Law because it "directly regulates how an airline service is performed and how its price is displayed to customers - not merely how the airline behaves as an employer or proprietor." *Id.* at 88. American Airlines began to

impose a service charge for curbside check-in and the Skycaps brought suit claiming the fee violated Massachusetts tipping law, which prevents an employer from demanding or deducting any payment out of employees' tips. *Id.* at 84. The First Circuit's holding – that the FAAAA preempted the tipping law – turned on "the *direct connection* to air carrier prices and services." *Id.* at 87 (emphasis in original). The tip law specifically regulated the rates American Airlines charged for its curbside check-in service, not merely an aspect of the parties' employment relationship which might change the market-forces calculus, as in this case. Section 148B does not regulate the price that 3PD charges for any service. It only regulates the operation of the underlying employment relationship which plays a role in setting the market price (as does all economic regulation). This is not sufficiently related to regulating the "price, route, or service" of motor carriers. *See S.C. Johnson & Son, Inc.* v. *Transp. Corp. of Amer.*, 697 F.3d 544, 558 (7th Cir. 2012) ("Capital is regulated by banking laws, securities rules, and tax laws, among others. . . . Changes to these background laws will ultimately affect the costs of these inputs, and thus, in turn, the 'price . . . or service' of the outputs. Yet no one thinks that the ADA or the FAAAA preempts these and the many comparable state laws."); *see also Phelps* v. *3PD, Inc.*, 261 F.R.D. 548 (D. Or.

31

2009) (certifying a class of drivers asserting wage law claims against 3PD).

3PD's attempts to save its argument by claiming that it does not contend that the FAAAA preempts Section 148B, only that it preempts the Wage Act and unjust enrichment claims.  This argument fails for the same reason the "enlarging the bargain" argument failed.  It ignores the fact that the Wage Act and unjust enrichment claims do not stand on their own, but are derivative of the Section 148B claim.  The Wage Act and unjust enrichment claims do not seek to regulate the prices 3PD sets for its services, as was the case in *DiFiore*, but rather to seek to enforce 3PD's obligations as an employer under Massachusetts law.

This same flaw dooms 3PD's final argument that the FAAAA preempts Plaintiffs' claims, not because they would impact 3PD's prices to customers, but because they would directly impact Plaintiffs' own prices as motor carriers under the DSAs.  This argument misses the point by misapprehending Plaintiffs' claims. Plaintiffs' claims do not implicate the prices under the DSAs. In fact, the claims repudiate the DSAs.  They claim instead that 3PD failed in its obligations under Massachusetts employment law, not that there was any error in performance under the DSAs.

   2. Count I - Classification under Section 148B

   Plaintiffs assert that they are employees of 3PD under M.G.L. 149 § 148B.  In order rebut the presumption of employee

status, 3PD must satisfy all three parts of the Section 148B test.  The parties cross-move for summary judgment as to Part 2 of the test: whether Plaintiffs' services were performed in the usual course of 3PD's business.  Plaintiffs additionally seek summary judgment as to Part 1: whether Plaintiffs were free from 3PD's control.

3PD is a last-mile delivery and logistics company.  It hired Plaintiffs to operate the delivery trucks and deliver its customers' products.  Notwithstanding 3PD's attempts to distance itself from its own marketing and statements through formalistic distinctions and disingenuous attacks on Plaintiffs' evidence, I find, as a matter of law, that Plaintiffs performed services within the usual course of 3PD's business.  Plaintiffs are therefore entitled to summary judgment on Part 2 of the Section 148B test.  By contrast, I will deny Plaintiffs' motion for summary judgment with respect to Part 1 of the Section 148B test because 3PD raises genuine issues of material fact regarding the extent of its control over Plaintiffs.  Of course, Plaintiffs need only succeed on any one of the three parts of the Section 148B test to be considered employees of 3PD.  *Somers*, 911 N.E.2d at 747.  Accordingly, I find that Plaintiffs are employees of 3PD for purposes of Massachusetts law.

*a. The Usual Course of Business*

Part 2 of the Section 148B test states: "an individual performing any service . . . shall be considered to be an employee . . . unless . . . the service is performed outside the usual course of the business of the employer."  M.G.L. 149 § 148B.  The Massachusetts Attorney General, whose interpretation is entitled to substantial deference,[6] stated that the relevant inquiry is whether the service provided is "necessary to the business" or "merely incidental to it," and whether the putative employee "is performing an essential part of the employer's business."  An Advisory from the Attorney General's Fair Labor Division on M.G.L. 149 § 148B ("Attorney General Advisory").  The Attorney General provided examples.  On the one hand, "if a drywall company classifies an individual who is installing drywall as an independent contractor," it would violate Section 148B.  *Id.* at 6; *see also Oliveira* v. *ICLB, Inc.*, No. 09-ADMS-10038, 2010 WL 2102992, at *3 (Mass. App. Div. Mar. 30, 2010).  On the other hand, an individual hired by an accounting firm to move office furniture may be an independent contractor because

---

[6] *See Elec. Data Sys. Corp.* v. *Attorney General*, 907 N.E.2d 635, 636-37, 640 (Mass. 2009); *Smith* v. *Winter Place LLC*, 851 N.E.2d 417, 421 (Mass. 2006) ("Insofar as the Attorney General's Office is the department charged with enforcing the wage and hour laws, its interpretation of the protections provided thereunder is entitled to substantial deference, at least where it is not inconsistent with the plain language of the statutory provisions.").

"the moving of furniture is incidental and not necessary to the
accounting firm's business."  Attorney General Advisory at 6.   In
*Rainbow Development*, a Massachusetts Superior Court stated that
the "[b]ottom line" is: if the defendant were to have employees,
whether those employees "would perform the same services as those
whom the Agreement terms as 'independent contractors.'"  *Rainbow
Development, LLC* v. *Dept. of Industrial Accidents*, No. SUCV2005-
00435, 2005 WL 3543770, at *3 (Mass. Super. Nov. 17, 2005).

Courts also consider how the putative employer holds itself
out to the public.  For instance, the Massachusetts Supreme
Judicial Court has held that news carriers performed services in
the usual course of the defendant's business because the
defendant defined itself as a business "publishing and
distributing" a daily newspaper.  *Athol Daily News* v. *Board of
Review of Div. of Emp. & Training*, 786 N.E.2d 365, 372 (Mass.
2003).  In *Jani-King*, janitorial workers performed services in
the scope of Jani-King's business because Jani-King "holds itself
out as a leader in commercial cleaning, and contracts directly
with customers to provide commercial cleaning services."  *De
Giovanni* v. *Jani-King*, No. 07-cv-10066, Hr'g Tr. 99:2-5 June 6,
2012.

3PD is clearly a delivery company, hiring Plaintiffs for a
vital and necessary aspect of its business.  Publicly, 3PD holds
itself out as a delivery company.  The homepage of 3PD's website

is titled "Residential Home Appliance Delivery, Last-Mile Business to Business Delivery."  The banner on every page of the website shows the 3PD logo and the subtitle: "Last Mile Delivery And Logistics Solutions."  And the "About Us" page reports "we make nearly 3 million residential, business and job site deliveries every year - all with the help of more than 1,700 highly qualified, uniformed delivery teams."

Quite independent of its marketing, 3PD appears to acknowledge that it is a delivery company.  The 3PD DSAs state "3PD provides logistical, transportation and delivery services for a number of substantial retail national accounts."  And 3PD contracts "directly with customers to provide [its] services" as in *Jani-King*.  *Jani-King*, Hr'g Tr. 99:2-5.

Without Plaintiffs, 3PD could not perform the delivery services that, both internally and publicly, appear to form the foundation of its business.  Plaintiffs perform services in the usual course of 3PD's business because "[t]he workers are engaged in the exact business [the employer] engaged in; [the employer] merely provides administration.  Without services of the workers, [the employer] would cease to operate." *Rainbow Development*, 2005 WL 3543770, at *3 (internal citations omitted).

3PD responds in three ways:

*First*, in support of its own motion for summary judgment, 3PD argues that it is not in the delivery business, but rather

the property brokering and freight forwarding business.  As a corollary, 3PD suggests that because Plaintiffs are licensed as motor carriers by the FMCSA, responsible for their own compliance with federal motor carrier regulations, the Court should find that Plaintiffs, not 3PD, run the entirety of the delivery business.  In this connection, 3PD relies on federal regulations which provide different definitions and regulations for motor carriers, property brokers, and freight forwarders.  *See* 49 U.S.C. § 13102(14) (defining motor carrier); 49 U.S.C. § 13102(8) (defining freight forwarder).  *Compare* 49 U.S.C. § 13906(a) (Motor Carrier requirements) *with* 49 U.S.C. § 13906(b) (Broker requirements) *and* 49 U.S.C. § 13906(c) (Freight Forwarder requirements).  3PD attempts to explain away the statements in its DSAs that "3PD provides logistical, transportation and delivery services" by arguing that it was Plaintiffs who were exclusively responsible for providing these services and that no one who 3PD considered an employee ever bore the responsibility of actually transporting or delivering its customers' goods.

3PD distinguishes cases cited by Plaintiffs, reasoning that in *Townsend Oil, Eastern Connection*, and *Oliveira* the defendants hired individuals they considered to be employees performing the same services as the plaintiffs, who defendants nevertheless classified as independent contractors.  *See Olivera* v. *Adv. Delivery Sys., Inc.*, No. 091311, 2010 WL 4072360 (Mass. Super.

Ct. Jul. 16, 2010) (defendant hired temporary employees to evaluate their suitability to be independent contractors in the future); *Fucci* v. *Eastern Connection Operating, Inc.,* C.A. 2008-2659 (Mass. Super. Ct. Sept. 21, 2009) (defendant hired employee drivers whose responsibilities were identical to the independent contractor drivers'); *Amero* v. *Townsend Oil Co.*, Civ. A. 07-01080 (Mass. Super. Ct. Apt. 15, 2009) (same).

This response begs the question whether 3PD provides delivery services.  3PD cannot persuasively argue that it did not provide delivery services because those services were provided by third parties when the question at issue is whether those third parties were employees of 3PD.  Nor can 3PD successfully avoid liability under *Townsend Oil, Eastern Connection,* and *Oliveira* simply by refusing to confer employee status on any driver at all.  That is merely an attempt to "separat[e] . . . executive and managerial functions" which is insufficient to "take the service provided by workers outside the course of a business." *Jani-King* Hr'g Tr. at 99.  That Congress created different obligations on motor carriers, freight forwarders, and property brokers has no bearing on whether Plaintiffs provided their motor carrier services as employees or independent contractors of 3PD. The fact remains that "without the services of the workers, [Defendant] would cease to operate." *Rainbow Development,* 2005 WL 3543770, at *3.  An employer cannot escape liability under

Section 148B by attempting to obfuscate the nature of its business or through simple sleight of hand.

This case in on all fours with *Oliveira*.  In *Oliveira*, just as in this case, the defendant required that delivery drivers form their own businesses and provide services purportedly as independent contractors.  *See Oliveira*, 2010 WL 4071360, at *1. The defendant claimed that it merely "manage[d] the retailers' delivery function while Owner-Operators perform the actual furniture deliveries to retail furniture customers' residences pursuant to written contracts with [the defendant]."  *Id.* at *6. The court held that "the managing and performing functions of furniture delivery result in a symbiotic relationship.  Without providing physical delivery of furniture, which is essential to its business, [Defendant's] business would not exist."  *Id.* Plaintiffs and 3PD exhibit this same symbiotic relationship. Without the delivery service, 3PD would not exist.

*Second*, in opposition to Plaintiffs' motion for summary judgment, 3PD argues that Plaintiffs have not sufficiently laid the foundation or authenticated the images of the 3PD website attached to Mr. Rabieh's affidavit.[7]  3PD also claims that the

---

[7] 3PD's reliance on *Wady* v. *Provident Life,* an out-of-circuit opinion, is misplaced.  Even if I were bound by *Wady*, and I am not, that case holds that a parent entity cannot be held responsible for statements on a subsidiary's website absent some authentication that the statement were made or ratified by the parent.  *See* 216 F. Supp. 2d 1060, 1064-65 (C.D. Cal. 2002).

images of the website represent the site during the wrong time period because Mr. Rabieh's declared that he visited the site in September 2012, but the putative class period began in June 2008, and Mr. Martins employment ended in 2011.

At very best, this argument is disingenuous.  The September 2012 image remains relevant to the class claims, as the class period extends to the present.  More fundamentally, the 3PD website appears to have remained substantially identical since it was created sometime in 2006-2007.[8]  Certainly all of the substantive content quoted above from the page itself has remained identical, save for slight changes in the number of deliveries and delivery teams.  3PD's objection to the time period of the website images is therefore composed of nothing but smoke.  3PD cannot manufacture a genuine factual dispute by making such hollow protestations.  *Triangle Trading Co.* v. *Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999) ("[C]onclusory allegations, improbable inferences, and unsupported speculation ... are insufficient to establish a genuine dispute of fact.")

---

[8] In addition to the historical version of the 3PD website attached to Mr. Rabieh's Affidavits dated October 23, 2012, I take judicial notice of the various historical versions of the 3PD website available on the Internet Archive at Archive.org as facts readily determinable by resort to a source whose accuracy cannot reasonably be questioned.  *Cf. Juniper Networks, Inc.* v. *Shipley*, 394 F. App'x 713 (Fed. Cir. 2010) (indicating, but not holding, that the Internet Archive may be an appropriate source for judicial notice).

*Finally*, in support of its motion for summary judgment with respect to Mr. Rocha, 3PD argues that Mr. Rocha cannot bring a claim under Section 148B because 3PD contracted only with Mr. Rocha's company, AAR Trucking, and had "no relationship" with Mr. Rocha himself.  3PD then asserts that Mr. Rocha's claims on Counts II and III must also fail because they presume success on Claim I under Section 148B.  3PD relies on *Weinberg* v. *Grande Circle Travel, LLC*, arguing that because *Weinberg* holds that Section 148B does not apply to corporate entities, *see* --- F. Supp. 2d ----, 2012 WL 4096611, at *6 (D. Mass. Sept. 19, 2012) ("[I]t is clear that [Section 148B] applies only to *individuals* who have been misclassified as independent contractors - not companies." (emphasis in original)), Mr. Rocha cannot state a claim.  This is a misinterpretation of *Weinberg.*

*Weinberg* holds only that the company *itself* cannot bring a claim under Section 148B.  It does not hold that an individual performing services for an entity is precluded from brining a Section 148B claim because he incorporated his business.  *See id.* at *6.  In fact, it is clear that an individual *can* bring a Section 148B claim even if he has incorporated his business, and the employer's formal relationship is with the entity and not the individual.

Mr. Rocha falls within the plain language of Section 148B as "an individual performing any service" for 3PD.  M.G.L. 149 §

148B.  In addition, the Massachusetts Attorney General has
addressed this specific issue, advising that Section 148B applies
to employers "that allow, request or contract with corporate
entities . . . that exist for the purpose of avoiding [Section
148B]."  Attorney General Advisory at 5.  3PD contends that
"there is no evidence in the record that 3PD requested or
required Rocha to incorporate," but this ignores the plain
language of the Attorney General Advisory, which includes the
word "allow."  3PD cannot allow Mr. Rocha to incorporate and then
use that incorporation as a shield for the purpose of avoiding
Section 148B liability.

A number of state and federal cases have held that an
individual can bring an action under Section 148B even if the
employer's formal contractual relationship is with an
incorporated entity.  *See, e.g.*, *Townsend Oil*, No. 07-1080 at 5
n.4 ("Townsend insists that Amero's decision to incorporate
precludes him from enjoying the benefits of the Wage Act. . . .
[N]ot only does Townsend's argument ignore economic reality, but
if it were to carry the day, any employer who wanted to avoid the
requirements of the Wage Act would simply require its employees
to incorporate as a condition of employment."); *De Giovanni* v.
*Jani-King,* 262 F.R.D. 71, 86 (D. Mass. 2009) (certifying a class
even though "the corporation controlled [one named plaintiff's]
franchise[.] [Named Plaintiff] still meets the broad class

definition for the employment classification claims - all "individuals who have performed cleaning work for Jani-King . . .").[9]

### b. Employer Control

Part 1 of the Section 148B test states, "[a]n individual performing any service . . . shall be considered to be an employee . . . unless . . . the individual is free from control and direction in connection with the performance of the service, both under his contract for the performance of service and in fact."  M.G.L. 149 § 148B.  This test "is not so narrow as to require that a worker be entirely 'free from direction and control.'"  *Athol Daily News* v. *Board of Review of the Div. of Emp. & Training*, 786 N.E.2d 365, 371 (Mass. 2003).  Rather,

> [t]he essence of the distinction . . . has always been the right to control the details of the performance and the freedom from supervision 'not only as to the result to be accomplished but also as to the means and methods that are to be utilized in the performance of the work.'

*Id.* (internal citations and quotations omitted).

---

[9] I note that, in a similar case, the District of Oregon recently certified a class of delivery drivers against 3PD itself despite the fact that "defendant informed its drivers that it would enter into new contracts . . . and would do so only with business entities that had been organized as a corporation or a limited liability company."  *Phelps* v. *3PD, Inc.*, 261 F.R.D. 548, 556 (D. Or. 2009).

Plaintiffs allege 12 elements of control by 3PD that they argue entitle them to a finding of employee status under Part 1 of the Section 148B test:

1   3PD required Plaintiffs to wear uniforms, although these uniforms did not necessarily bear the 3PD logo, and sometimes bore the logos of 3PD's customers.

2   3PD required Plaintiffs to maintain an "acceptable appearance."

3   3PD required Plaintiffs' trucks to bear the 3PD logo.

4   3PD required Plaintiffs to report for duty at a specific time each day.

5   3PD set Plaintiffs delivery routes.

6   3PD required Plaintiffs to make deliveries in a certain order.

7   3PD required Plaintiffs to obtain permission before changing the order of deliveries that 3PD established.

8   3PD required Plaintiffs to update 3PD as the start and completion of each delivery.

9   3PD required Plaintiffs to return any appliances "hauled away" from a delivery site to the warehouse or store from which the Plaintiff picked up his products for delivery.

10   3PD monitored Plaintiffs performance through customer surveys.

11   3PD disciplined Plaintiffs in the event of poor scores on customer surveys, including by terminating their contract or by not giving them deliveries for a certain number of days.

12   3PD deducted "chargebacks" from drivers' pay when drivers were responsible for damage to delivered products.

If true, as Plaintiff contends, this would constitute a
sufficient level of control to confer employee status on
Plaintiffs under Massachusetts law.  However, 3PD disputes the
nature or characterization of many of these elements.  As the
movants, Plaintiffs bear the burden of showing that "there is no
genuine dispute as to any material fact" and that on the basis of
the facts to which there is no genuine dispute, they are
"entitled to judgment as a matter of law."  Fed. R. Civ. P.
56(a).  The factual record regarding control remains unclear and
intensely disputed.

3PD disputes the substance of elements 4, 5, 6, and 7.  It
disputes the characterization of 1, 10, and 11.  It disputes the
relevance of 8, 9, and 12.  And, finally, it appears to admit
elements 2 and 3.  I address each of these categories in turn.

*First*, for elements of control 4, 5, 6, and 7, Plaintiffs
contend that 3PD dictated the details of Plaintiffs routes, when
to arrive at the warehouse or retail store, the order of
deliveries, the acceptable delivery windows, and that 3PD
required Plaintiffs to seek permission before deviating from any
of these dictated requirements.  3PD, however, contends that it
did not set delivery routes, but that Plaintiffs used their own
GPS systems to determine routes to and from destinations.  It
also contends that Plaintiffs had discretion to change delivery
routes and orders under certain circumstances, for example, if a

consumer was not home.  Finally, it alleges that it did not require Plaintiffs to "report for duty" at a specific time, only that it passed on its customers' rule not to make any deliveries before 7:30 am.  Plaintiffs rely on their own deposition testimony and that of other putative class members.  This testimony conflicts with testimony by 3PD Managers that 3PD relies on.  That creates a genuine issue of material fact inappropriate for resolution on a motion for summary judgment.

*Second*, in elements 1, 10, and 11, Plaintiffs contend 3PD required Plaintiffs to wear uniforms, monitored their performance through customer surveys, and disciplined them for poor survey results.  The proximity of Plaintiffs' arguments regarding 3PD's requirement that Plaintiffs wear uniforms and that Plaintiffs' trucks bear the 3PD logo appears to imply that the uniforms also bear the 3PD logo.  However, 3PD points out that Mr. Martins testified that his required uniform stated "GE-authorized delivery personnel."  This is an important distinction in the Section 148B inquiry.  *See Oliveira*, 2010 WL 4071360. *5 n.6 (distinguishing *Eastern Connection* on the basis that in that case, "employees were required to wear uniforms bearing their employer's name while [in this case, plaintiff] was required to wear uniforms bearing [Defendant's customer's] logo, not [Defendant's]").  3PD also contends that there is no overarching policy regarding uniform requirements, but that it varies widely

market to market.  This also creates a genuine issue of material fact inappropriate for resolution on summary judgment.

3PD argues that Plaintiffs have provided no evidence that 3PD ever communicated the results of the surveys to Plaintiffs or that any termination was the result of poor results on surveys. However, this does not undercut the potency of the surveys as a method of control.  Plaintiffs' understanding that poor results on a customer survey can lead to fewer delivery assignments gives teeth to the other elements of control such as appropriate appearance and delivery windows.  This mechanism of enforcing other controls weighs in favor of a finding of control.

*Third*, in elements 8, 9, and 12, Plaintiffs allege that 3PD required Plaintiffs to check in on the status of their deliveries, return customer products that Plaintiffs "hauled away" from the delivery locations, and that 3PD made deductions from Plaintiffs' pay if a product was damaged during transportation or delivery.  3PD argues that none of these elements evince employer control.  With regard to the "haul aways," I am inclined to agree.  Contracting to haul products away from a particular location is no different than contracting to deliver products to a particular location.  This is merely the delivery service itself and not evidence of 3PD exerting control over the manner of the service.

3PD argues that the "chargeback" mechanism is actually evidence of Plaintiffs' independence because Plaintiffs - and not 3PD - have complete control over the loading, transportation, and delivery of products, and therefore any damage to products that 3PD must address demonstrates that Plaintiffs themselves are responsible for the manner and quality of the delivery. Plaintiffs challenge this assertion, arguing that because 3PD makes the ultimate and unappealable decision to deduct the cost of any damage, it operates as a form of control over the manner and quality of Plaintiffs' services.  This, too, is a question of fact inappropriate for resolution at this stage.  No party is entitled to judgment as a matter of law regarding whether this deduction mechanism operates as an employment control.

3PD contends that its requirement that Plaintiffs call as they begin and complete each delivery is not relevant to the control analysis pursuant to *Oliveira*.  In *Oliveira*, the plaintiff argued that the defendant's requirement that he send GPS transmissions from each point of delivery operated as a form of control.  2010 WL 4071360, at *5.  The defendant responded that this was not a form of control, but rather a way for defendant's customers to check the status of their deliveries.
*Id.*  The court held,

> If taken to be true, the primary purpose of the GPS
> system was to offer a supplementary service to
> [defendant's customers], not for [defendant] to control
> or direct [Plaintiff's] means and method of delivery.

48

> At minimum, there exists a material issue of fact which
> precludes . . . summary judgment.

*Id.*  The GPS requirement in *Oliveira* is materially

indistinguishable from the status update requirement here.  The

status update requirement is not primarily a measure of control

if it operates as a supplementary service.  As in *Olivera*, this

creates an dispute of fact.

3PD also levels this same 'customer-driven' argument at a

number of the other alleged elements of control, stating that

elements 1 (uniforms), 2 (acceptable appearance), 3 (3PD logo on

trucks), 10 (customer surveys), and 11 (discipline for poor

performance on surveys) should all present disputes of fact

because they are driven by request of 3PD's customers.  This

pushes the argument too far.  Not all customer-driven

considerations are irrelevant to employer control.  *See Eastern

Connection*, No. MICV 2008-2659, at 7 (finding that "while

[defendant] asserts that the pickup and delivery times listed on

these manifests were customer-driven guidelines" this

nevertheless operated as employer control because "plaintiffs

were required to comply with specific customer pickup and

delivery requirements").  The distinction turns on whether the

primary purpose of the putative control is a supplementary

service or a mechanism of quality control.  The uniforms and

surveys fairly could be construed as supplementary services

because 3PD alleges that delivery drivers' uniforms vary widely

market to market, and surveys afford 3PD's customers a measure of direct control and supervision akin to the GPS coordinates in *Oliveira*.  However, enforcing acceptable appearance and disciplining drivers for poor survey performance are mechanisms of quality control that cannot be fairly construed as "supplementary."  Likewise, requiring drivers to paint their trucks with the 3PD logo cannot be construed as a supplementary service offered to customers because it is plainly for 3PD's benefit.

*Finally*, 3PD does not dispute the acceptable appearance or truck logo requirements.  Therefore, on the undisputed facts, Plaintiffs can show elements 2 (acceptable appearance), 3 (3PD logos on trucks),[10] and 11 (discipline for poor survey performance).  3PD also points out that Plaintiffs were not bound by a non-compete agreement as the court in *Townsend Oil* emphasized in its finding of employer control, *see* No. 07-1080-C at 4-5, that Plaintiffs had discretion to hire other drivers and helpers under their DSAs, and that they had absolute discretion regarding those other drivers' payment, *but see Eastern*

---

[10] 3PD's reliance on *Commissioner of the Div. of Unemployment Assistance* v. *Town Taxi of Cape Cod*, 862 N.E.2d 430 (Mass. App. Ct. 2007) for the proposition that requiring drivers to paint their vehicles with the 3PD logo is not evidence of control is misplaced.  In *Town Taxi*, the defendant itself owned the vehicles and provided them to the drivers.  *See id.* at 433.  It did not require any action on the part of its drivers regarding their own vehicles.

*Connection*, No. MICV 2008-2659 at 8 (finding employer control despite plaintiffs' discretion regarding paying other driver-employees and no demand regarding specific routes).  I credit Plaintiffs' response that this freedom to contract elsewhere is substantially diminished by the requirement that the trucks bear the 3PD logo.

On these undisputed facts, Plaintiffs fall short of their burden, though not far short.  In *Townsend Oil*, the court found employer control where the plaintiff "had to have the truck painted with the [defendant] company logo . . . was required to deliver . . . to the customers [defendant] designated on the days [defendant] stipulated . . . [and plaintiff] had no discretion regarding what price to charge [Defendant]'s customers." *Townsend Oil*, No. 07-1080-C at 4.  However, crucially in *Townsend Oil*, the court emphasized that the defendant required its drivers to sign non-competition agreements, which do not appear in the facts of this case.  *See id.* at 4-5.  Similarly, in *Eastern Connection,* the court primarily relied on the defendants dictating the particular delivery schedule, an issue disputed in this case.

*          *          *

Plaintiffs cannot show, based on undisputed facts, that 3PD exercised "control and direction in connection with the performance of the service."  Nevertheless, Plaintiffs are

entitled to summary judgment as to the entirety of Count I because the Section 148B test is conjunctive and they have demonstrated that 3PD cannot prove Part 2 of the test. Therefore, under Massachusetts law, Plaintiffs are employees of 3PD.

2. <u>Counts II and III - Wage Act and Unjust Enrichment</u>

3PD premises its motion regarding Counts II and III on the same faulty arguments it offers in support of its motion for summary judgment regarding Part 2 of the Section 148B test: (1) that Mr. Rocha cannot demonstrate that 3PD ever deducted money from his paycheck because the formal relationship was with AAR Trucking, *see supra* Section IV(B)(2)(a), and (2) that the FAAAA preempts Mr. Martins' claims, *see supra* Section IV(B)(1). Mr. Rocha falls within the ambit of Section 148B, and is therefore eligible under Massachusetts law to be an employee of 3PD despite doing business through an incorporated entity, AAR Trucking. Any deductions 3PD may have made from Mr. Rocha's pay or business costs and thereby shifted to him through AAR Trucking are matters of fact which preclude summary judgment. Similarly, because Mr. Martins' claims are not preempted, his damages under Counts II and III are matters of fact not subject to summary judgment on this record. I therefore deny 3PD's motions for summary judgment regarding Counts II and III of the Complaint.

## V.   CONCLUSION

For the foregoing reasons, I grant Plaintiffs' motion to amend the complaint (Dkt. 21) insofar as it seeks to add an additional named Plaintiff, but deny it insofar as it seeks to add individual defendants.   I grant Plaintiffs' motion for class certification (Dkt. 40) as to Count I, but deny it as to Counts II and III.   I grant Plaintiffs' motion for summary judgment as to Count I (Dkt. 42).   I deny 3PD's motion for summary judgment as to Mr. Rocha (Dkt. 37).   Finally, I deny 3PD's motion for summary judgment as to Mr. Martins (Dkt. 34).


_____ **/s/ Douglas P. Woodlock**
                                    DOUGLAS P. WOODLOCK
                                    UNITED STATES DISTRICT JUDGE